IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

XAVIER LOVE,

                Plaintiff,

  v.

DR. KARL HOFFMANN, KOREEN FRISK,
CAROL SWAN, NICOLE KRAHENBAHL,
BRIDGET RINK, MARYAH MARTIN,
MICHELLE SCHROEDER, and
DR. MARK HEBERLEIN,

                Defendants.

OPINION and ORDER

18-cv-386-jdp

---

Plaintiff Xavier Love, who is incarcerated at New Lisbon Correctional Institution, alleges that prison medical staff and hospital employees failed to properly treat the torn Achilles tendon he suffered playing basketball, delayed in arranging surgery, failed to adequately treat his pain, and disregarded his infected incision after the surgery. He is proceeding on claims under the Eighth Amendment and Wisconsin law.

The state defendants[1] (Dr. Karl Hoffmann, Koreen Frisk, Carol Swan, Nicole Krahenbahl, Bridget Rink, and Maryah Martin) and the hospital-staff defendants (Nurse Michelle Schroeder and Dr. Mark Heberlein) have filed motions for summary judgment. Dkt. 37 and Dkt. 45. Because I conclude that Love has not submitted evidence showing that the state defendants were negligent or acted with deliberate indifference to his medical needs, I will grant the motion for summary judgment filed by Hoffman, Frisk, Swan, Krahenbahl, Rink, and Martin. I will decline to exercise supplemental jurisdiction over Love's negligence claims

---

[1] I have amended the caption to reflect the correct spelling of each defendant's name.

against the hospital-staff defendants, Schroeder and Heberlein. I will dismiss those claims without prejudice so that Love can refile them in state court if he chooses to do so. Finally, I will deny Love's motions requesting that the court recruit counsel to assist him with this case.

UNDISPUTED FACTS

The following facts are drawn from the parties' summary judgment materials and are undisputed unless noted otherwise.

A. The parties

Plaintiff Xavier Love is incarcerated at New Lisbon Correctional Institution, where several defendants worked during the relevant time period: Karl Hoffmann (physician), Koreen Frisk (nurse clinician 2), Carol Swan (registered nurse), Nicole Krahenbahl (nurse clinician 2), Bridget Rink (registered nurse), and Maryah Martin (registered nurse). Defendants Michelle Schroeder and Dr. Mark Heberlein worked at Mile Bluff Medical Center, a hospital in Mauston, Wisconsin. Health services staff regularly send New Lisbon inmate patients to Mile Bluff Medical Center for emergency trips and non-emergent services, including podiatry. Health services may also send inmates to other hospitals, including University of Wisconsin Hospital, Waupun Medical Center, and Gundersen Medical Center.

B. Love's Achilles tendon injury

On December 22, 2017, Love injured his right ankle while playing basketball during recreation. He was taken to the health services unit, where he told defendant Nurse Rink that he thought he had torn his Achilles tendon. Medical providers generally conduct a physical exam if they suspect an Achilles tendon injury. A physical exam can reveal a gap in the Achilles tendon that can indicate malformation or injury. The "Thompson test" is a specific type of

2

physical exam that indicates whether the Achilles tendon is completely torn. Rink was not trained to perform the Thompson test and she did not attempt to do so. She examined Love's ankle, noted that it had a "divot," that his Achilles tendon was "not palpable," and that his foot was "dangling" and swollen.

Rink sent Love to the emergency room at Mile Bluff Medical Center. Defendant Dr. Mark Heberlein, the emergency room doctor, ordered x-rays of Love's ankle. The x-rays showed an Achilles tendon injury, but Heberlein could not tell whether Love had a partial or complete tear. Heberlein recommended that Love contact orthopedics on December 26, 2017 to schedule an MRI. He also recommended that Love take either ibuprofen or naproxen and keep all weight off of his right foot. Defendant Nurse Schroeder placed a splint on Love's foot and directed him to leave the splint in place except when bathing.

After Love returned from the hospital, Nurse Rink gave Love ibuprofen. The ibuprofen did not relieve Love's pain and made his stomach hurt. On December 23, another nurse gave Love acetaminophen and defendant Dr. Hoffmann increased Love's ibuprofen prescription. On December 26, Hoffmann received the emergency report from Mile Bluff Medical Center. Hoffmann ordered Love a wheelchair and crutches, extra pillows, ice, a low-tier and low-bunk restriction, and Vitamin C to help with the healing process. Hoffmann also ordered an MRI of Love's right ankle and lower leg and a follow-up appointment with Mile Bluff orthopedics.

Health services staff called Mile Bluff to schedule the MRI and orthopedic appointment. The earliest appointment available was on January 2, 2018, so Love's MRI was scheduled for January 2. Staff wrote in Love's progress notes that Mile Bluff was "aware it was a STAT order," meaning that the hospital knew that Love's situation was a high priority.

3

During the time in which Love waited for his MRI appointment, Love was in severe pain. On December 28, 2017, Hoffmann prescribed a three-week course of tramadol, a narcotic pain reliever. The tramadol did not relieve all of Love's pain.

On January 2, Love had an MRI of his right ankle. The results showed a complete tear of the Achilles tendon. Love was scheduled for a follow-up appointment with Mile Bluff on January 8, 2018, but Mile Bluff rescheduled the appointment for January 10. In the meantime, on January 4, Hoffmann increased Love's ibuprofen prescription.

On January 10, Love met with Dr. Marissa McNelly, a podiatrist, at Mile Bluff. (McNelly is not a defendant in this case.) McNelly discussed treatment options with Love, including the pros and cons of surgery versus more conservative treatment options. Love and McNelly decided that surgery was appropriate for Love's injury. McNelly told Love to keep all weight off his right foot, keep his foot elevated, and use ice. After Love returned to the prison, Dr. Hoffmann wrote an order to schedule Love for surgery "next week" and "ASAP" to repair the Achilles tendon rupture. Surgery was scheduled for January 19, 2019.

On January 12, Love fell while using his crutches. He was given additional tramadol and told to use his wheelchair, elevate his foot, keep weight off, and apply ice.

On January 19, Love had surgery to repair his Achilles tendon tear. The surgery was successful. After Love returned to the prison, he was given a walking boot, more tramadol, Flexeril (a muscle relaxant), an anti-nausea medication, and stool softeners.

C. Love's treatment postsurgery

Love returned to Mile Bluff Medical Center for follow-up appointments on February 1 and 14, 2018, and he reported no significant concerns. On February 25, Love saw a nurse in health services after housing unit staff reported that his surgical incision was open. The nurse

4

noted that the incision was intact, that there was a superficial scratch near the bottom of the incision, and that his incision was closed with Steri-strips. Love told the nurse that the incision had been draining, but the nurse noted that there was no current drainage, redness, warmth, or swelling. The nurse told Love to avoid touching his incision and to monitor it for drainage, warmth, redness, and odor.

On March 12, 2018, Love went to Mile Bluff for a follow-up appointment. Dr. McNelly noted that Love's incision was healed except a small area. Love reported to McNelly that he had put some weight on his foot with minimal pain. McNelly lifted Love's non-weightbearing restriction and told Love that he could use a stationary bike and do upper body strengthening during recreation. She also instructed Love to continue wearing his boot and to wear compression stockings. When Love returned to the prison, he received bandages for his incision and was instructed to monitor the area for changes.

On March 13, Love submitted a health service request stating that he was in pain. The request was referred to Dr. Hoffmann, who responded that he would see Love that week.

On March 14, Love submitted a health service request stating that his ankle and foot were sore and tingling and that his ibuprofen, tramadol, and Flexeril were not relieving his pain completely. The next day, Nurse Rink met with Love and told him that she would review his concerns with Dr. Hoffman. Rink also told Love it was possible that he had "tarsal tunnel syndrome," which is pain caused by a compressed nerve in the ankle or foot.

On March 18, Love submitted another health service request complaining about pain. He saw Nurse Frisk the next day and reported that he had throbbing pain in his left leg that was "excruciating." Frisk noted that Love was not displaying signs of pain and told him that he did not "look" like he was in pain. She noted that his incision was clean, dry, and intact, she

5

gave him new compression socks, and she advised him to keep his foot elevated to reduce swelling and the "throbbing" sensation. Love asked Frisk to contact the Dr. McNelly about his pain, but she declined to do so, as nurses are not authorized to contact outside providers directly about inmate patients. Frisk told Love that she would share his pain concerns with Dr. Hoffman. She did so, and Hoffmann prescribed aspirin, an analgesic pain reliever, and anti-inflammatory medication that same day.

On March 22, Love submitted a health service request complaining of pain shooting from his foot up his leg. Nurse Krahenbahl saw Love the next day. Love's blood pressure was elevated. Love told Krahenbahl that his incision area "didn't look right" and was painful, but Krahenbahl did not observe any abnormalities in Love's incision and noted that the incision site was healing well. Krahenbahl told Love that he had an appointment scheduled at Mile Bluff and that she would discuss his concerns with Dr. Hoffmann. That same day, Krahenbahl contacted Hoffmann about Love's pain, and Hoffmann prescribed acetaminophen.

On March 25, 2018, security staff reported to health services that Love had taken off his prosthetic boot and was wearing sandals while exercising. They also reported that Love stood while lifting weights with his upper body and walked around with no difficulties or signs of pain.

On March 27, Love saw Nurse Swan in health services with complaints of pain in his right foot and leg. Swan noted some swelling in Love's right leg, that his open incision area "did not look right," and that Love was not wearing his compression socks. Swan told Love to use the prosthetic boot and compression socks regularly, to elevate his foot, and to use his pain medication as instructed. Swan told Love that he was scheduled to see Hoffmann on June 4

and that there was not much she could do for him in the meantime. On April 2, 2018, Love began physical therapy to increase the range of motion in his ankle.

On April 3, Love returned to Mile Bluff for a follow-up appointment. Dr. McNelly recommended physical therapy twice a week, the walking boot, ibuprofen, and ice as needed. McNelly's notes do not mention any concern about a potential infection.

On April 5, Love saw Dr. Hoffman. During the appointment, Love stated that he had pain at the bottom of his right foot radiating up his heel and behind his knee. He also said that there had been fluid draining from his right ankle. Hoffmann examined Love's ankle, stated that he would ask the physical therapist to evaluate Love for muscle spasms, and scheduled an ultrasound.

On April 6, Love submitted a health services request stating that his leg and ankle were in excruciating pain. On April 9, Love saw Nurse Frisk in the health services unit and told her that he had been experiencing headaches and ankle and leg pain that felt like "pins and needles." His blood pressure was elevated, and he told Frisk that his pain level was 10 out of 10. Love asked Frisk if she could contact Dr. McNelly, but Frisk was not authorized to do so. Love also asked Frisk if she could talk to Hoffmann about prescribing a different medication because acetaminophen was not helping with the pain and ibuprofen was hurting his stomach. Frisk stated that Love did not "look like" he was in pain based on how he was sitting, and she noted in her report that Love's pain complaints "appear[ed] excessive." She passed on Love's complaints and requests to Hoffman, but Hoffmann continued Love's ibuprofen prescription.

On April 16, Love submitted a health service request asking to see Dr. Hoffmann because he was experiencing excruciating pain and nerve pain shooting up his leg. Love saw Nurse Rink the next day. Rink noted that Love's blood pressure was elevated, that his incision

7

was irritated, that there was blood on his compression sock, and that his ankle was warm to the touch. Love asked Rink to call Dr. McNelly, but Rink refused. Rink consulted with Dr. Hoffmann and scheduled an appointment with Hoffmann for the next day.

On April 18, Love saw Dr. Hoffman. Hoffmann examined the incision and stated that it looked infected, was draining, had a foul smell, and was warm to the touch. Hoffmann ordered a "wound culture," prescribed a two-week course of antibiotics, and requested an appointment with Mile Bluff. Love was transported to Mile Buff that same day. Dr. McNelly recommended that Love receive daily dressing changes and additional ibuprofen, avoid weightbearing on the right foot, stop doing physical therapy, and rest, ice, and elevation of his foot. When Love returned to the prison, Hoffmann accepted all of McNelly's recommendations and directed that a follow-up appointment with Mile Bluff be scheduled.

On April 24, Love filed a health service request complaining about pain and tingling in his right foot. He saw Nurse Swan the next day. Love told Swan that it felt like "pins and needles" were shooting up and down his leg and he asked for a "nerve test." He also stated that his incision hurt, that it had been draining, and that the ibuprofen was upsetting his stomach. Swan noted that Love's incision had some "scant" drainage. She instructed Love to continue taking his antibiotic, to try taking multiple pain medications together to ease his pain, and to eat when taking his ibuprofen to decrease his stomach problems. Swan consulted with Hoffman, who directed that Love be scheduled to see Dr. McNelly to determine whether a nerve test was warranted. An appointment with McNelly was set for May 14, 2018.

On May 7, 2018, Love saw Nurse Krahenbahl in health services for complaints of pain. Love said that he expected to have no pain, and Krahenbahl responded that that was an unrealistic expectation due to the type of injury and surgery he had experienced. Krahenbahl

8

also told Love that she had knee surgery in the past, that she had been dealing with pain for years, and that Love would need to learn to deal with having pain. She told Love that he was scheduled to see Dr. Hoffmann on June 4 and that she did not believe Hoffman would prescribe narcotic pain medication, but that she would ask Hoffmann if he would change the ibuprofen to meloxicam in the meantime. Krahenbahl consulted with Hoffmann, who discontinued the ibuprofen and prescribed meloxicam instead.

On May 13, 2018, Love submitted a health services request stating that he had throbbing pain and numbness in his right ankle and leg, that his medications were not relieving his pain, and that he was having difficulty sleeping. He saw Nurse Swan in health services the next day. Swan told Love to keep taking his prescribed medication because she was not authorized to prescribe something different. She also asked Love about his past drug use, stating that past drug use can decrease the effectiveness of pain medications. Love denied using illegal drugs. Swan later spoke with Hoffmann about increasing Love's meloxicam dose, but Hoffmann declined to do so.

On May 14, Love saw Dr. McNelly at Mile Bluff. McNelly made several recommendations, including physical therapy, diclofenac for pain, and Capsaicin cream for pain. McNelly noted that Love's wound was completely healed and that an ultrasound showed that the Achilles tendon repair was in good condition. When Love returned to the prison, he received a topical pain reliever, but he did not receive diclofenac.

On May 17, 20, 25, and June 20 and 24, 2018, Love wrote to health services stating that he was in excruciating pain, that ibuprofen was hurting his stomach, and that he had not yet received the diclofenac recommended by Dr. McNelly.

9

On May 30, 2018, Dr. Hoffmann prescribed an additional antibiotic and ordered an MRI of Love's lower leg to address a possible infection or abscess. The results of the MRI showed no evidence of deep infection or abscess. After reviewing the results, Hoffmann ordered an EMG of Love's lower right leg to diagnose possible nerve compression. On June 4, Hoffmann prescribed omeprazole for Love's stomach problems. On June 7, Hoffmann submitted a request to prescribe diclofenac.

On June 13, Dr. Hoffmann ordered ice, an extra pillow, and a low tier and low bunk restriction for Love. Hoffmann also requested a consultation with physical therapy to address swelling with Love's Achilles tendon that was causing tarsal tunnel syndrome.

On June 21, Love saw Nurse Martin in health services. Love complained of pain in his right lower leg, numbness, tingling in his right lower extremity, decreased range of motion to his right ankle, and concerns about delayed medication. (This was the only time that Martin met with Love between December 22, 2017, and July 31, 2018.) During the appointment, Martin provided Love with information about postsurgical pain, the healing process, and nonmedication relief measures. She told him to exercise more to relieve the pain and to avoid wearing his compression stocking in bed. (Love says that Martin also told him, "You're not getting any more pain meds, so grow up and act like a man." Martin denies saying this.)

On June 28, 2018, Dr. Hoffmann ordered duloxetine for Love's nerve pain. Hoffmann also requested a consultation with Dr. O'Brien, an orthopedic physician who came to New Lisbon once or twice each month. Hoffmann renewed Love's prescription for aspirin and Capsaicin topical cream. On July 3, Love was sent to Miles Bluff Medical Center for a follow-up appointment. Dr. McNelly noted that Love had "excruciating knee pain," but "has no pain with the Achilles tendon at this time." McNelly gave Love a tarsal tunnel injection and ordered

10

an EMG. On July 7, Love wrote to Hoffmann requesting another injection because his nerve pain had returned. On July 9, Hoffmann ordered additional physical therapy to address the tingling behind Love's knee. On July 23, Love was issued a TENS unit, and on July 31, Hoffmann increased Love's duloxetine prescription to address his continuing nerve pain.

ANALYSIS

Love is proceeding on Eighth Amendment and state law claims against the state defendants, and state law negligence claims against the hospital defendants. The state defendants have moved for summary judgment on all of Love's Eighth Amendment claims, arguing that Love cannot prove that they acted with deliberate indifference to his Achilles tendon injury or subsequent pain and infection. They also argue that Love cannot prove that they were negligent because he has not disclosed an expert witness to establish the standard of care and because the evidence shows that they were not negligent. The hospital defendants, Schroeder and Heberlein, filed a separate motion for summary judgment, also arguing that Love cannot succeed on his negligence claims because he has failed to disclose an expert. I address each of defendants' arguments below.

**D. State defendants**

    **1. Eighth Amendment**

The Eighth Amendment imposes a duty on prison officials to take reasonable measures to guarantee an inmate's safety and to ensure that inmates receive adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). A prison official's "deliberate indifference" to a prisoner's medical needs or to a substantial risk of serious harm violates the Eighth Amendment. *Id.* at 828; *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). To survive summary

judgment, Love must present evidence suggesting that he suffered from an objectively serious medical condition and that the defendants knew about the condition but disregarded it by failing to take reasonable measures to address it. *Farmer*, 511 U.S. at 834; *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015).

Love has presented evidence showing that his torn Achilles tendon and associated pain and infection were objectively serious medication conditions. He has also presented evidence that the state defendants, all of whom were part of New Lisbon Correctional Institution's health services staff, were aware of his serious medical needs. This leaves the question whether defendants failed to properly treat Love's serious medical needs and instead, knowingly disregarded "'an excessive risk to [his] health or safety.'" *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (quoting *Farmer*, 511 U.S. at 837). Love has not made this showing with respect to any of the defendants.

a. **Nurse defendants**

Defendants Rink, Frisk, Swan, Krahenbahl, and Martin were nurses who responded to Love's requests for care on several occasions. Love concedes that each of these nurses saw him and provided him some care, but he argues that they provided him with inadequate care under the circumstances. Because these defendants provided Love with some treatment, the relevant question under the Eighth Amendment is whether their actions were "such a substantial departure from accepted professional judgment, practice, or standard, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261-62 (7th Cir. 1996). Love has not submitted evidence to suggest that these nurses failed to use medical judgment in making treatment decisions.

Love complains that when Nurse Rink first evaluated him for an Achilles tendon injury, she acted with deliberate indifference by failing to conduct a "Thompson test." But Rink performed a physical exam and then ordered that Love be transported to the hospital immediately so that he could be evaluated by doctors. Her actions were reasonable, and Love has not shown that he suffered any harm from her failure to perform a Thompson test. The evidence shows that Rink was not trained to administer the test and, because Rink ordered that Love be transported to the hospital immediately, the test would have provided no additional information relevant to Rink's treatment of Love.

Love also complains that on March 15 and April 17, Rink failed to provide him relief for his pain and infected incision. But the evidence shows that at the time of the March 15 appointment, Dr. Hoffmann had prescribed ibuprofen, tramadol, and Flexeril already. Rink told Love that she would review his concerns with Hoffmann, and she did so. On April 17, Rink assessed Love and told him that she would schedule him to see Hoffmann the following day. Love argues that Rink should have contacted Hoffmann immediately about his pain, but Rink's decision to require Love to wait one day to see a doctor about nonemergent pain, for which he was being treated already, was reasonable. The Eighth Amendment does not give a prisoner a right to specific treatment or a specific provider on demand. *See Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016) ("[D]elays are common in the prison setting with limited resources, and whether the length of a delay is tolerable depends on the seriousness of the condition and the ease of providing treatment.").

As for the other nurses, the undisputed evidence shows that on each occasion that they interacted with Love, they assessed him and consulted with Dr. Hoffmann regarding his complaints of pain.

Nurse Frisk saw Love twice for his complaints of pain during the relevant time period: on March 19 and April 9, 2018. On both occasions, she consulted with Dr. Hoffmann, and Hoffmann prescribed medications for Love.

Nurse Swan saw Love three times: on March 27, April 25, and May 14. At the first appointment, Swan told Love that he was not scheduled to see Dr. Hoffmann until June and that he should wear his boot and compression stockings, elevate his foot, and take his ibuprofen and acetaminophen together to treat the pain. At the April 25 appointment, Swan examined Love's incision, instructed Love to continue taking his antibiotic, suggested that Love take multiple pain medications together to ease his pain, and suggested that he eat when taking his ibuprofen to decrease his stomach problems. Swan also consulted with Hoffman, who directed that Love be scheduled to see Dr. McNelly. On May 14, Swan told Love to keep taking his prescribed medication because she was not authorized to prescribe something different. Swan spoke with Hoffmann about increasing Love's meloxicam dose, but Hoffmann declined to do so.

Nurse Krahenbahl saw Love on March 23 and May 7, 2018. On March 23, she evaluated his incision and concluded that it looked fine, instructed him to take ibuprofen, and consulted with Dr. Hoffmann, who prescribed acetaminophen. On May 7, she told Love that she would ask Hoffmann if he would change Love's ibuprofen prescription to meloxicam. After Krahenbahl consulted with Hoffmann, Love received meloxicam.

Nurse Martin saw Love once, on June 21, 2018, for his complaints of leg pain, numbness and tingling, decreased range of motion in his right ankle, and medication delays. She provided Love with information about postsurgical pain and the healing process. She also

noted that a prescription for diclofenac had been filled the day before and that Love had Capsaicin cream.

Love alleges that the nurse defendants made callous remarks regarding his pain, such as Frisk's alleged statements that Love did not "look like" he was in pain, Swan's questions about prior illegal drug use, Krahenbahl's statement that Love would need to learn to live with pain, and Martin's statement that Love was "not getting any more pain meds, so [he needed to] grow up and act like a man." Defendants deny making some of these statements. But even if I assume that defendants did make these remarks, these statements alone are not sufficient to show deliberate indifference to Love's medical needs. *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000) (verbal harassment or rude comments by prison staff alone does not violate the Constitution); *Patton v. Przybylski*, 822 F.2d 697, 700 (7th Cir. 1987) (unprofessional conduct does not violate the Constitution). To prove deliberate indifference, Love had to submit evidence showing that the nurses treatment decisions were "blatantly inappropriate." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). He has failed to do so. Even if they made these remarks, it is undisputed that they responded promptly to all of Love's health service requests, evaluated him, provided treatment suggestions, and consulted with his doctor. Therefore, the nurse defendants are entitled to summary judgment on Love's Eighth Amendment claims.

### b. Dr. Hoffmann

The final state defendant is Dr. Hoffmann, the prison physician primarily responsible for prescribing pain medication and ordering appointments with specialists. Love contends that Hoffmann acted with deliberate indifference by delaying Love's MRI and Achilles tendon surgery. But the evidence does not support Love's argument. The evidence shows that Hoffmann ordered the MRI as recommended by Dr. Heberlein, the emergency room doctor,

15

as soon as Hoffmann received and reviewed the emergency room report on December 26, 2017. Health services staff called the hospital and scheduled the MRI for the earliest available appointment, which was January 2, 2018. Hoffmann prescribed ibuprofen, tramadol, a wheelchair, crutches, extra pillows, ice, a low-tier and low-bunk restriction, and Vitamin C to relieve Love's pain and help with healing while Love waited for the MRI. These facts do not suggest deliberate indifference, but instead show that Hoffmann acted promptly to review Love's emergency room report, order the MRI, and prescribe pain medications and other interventions to help Love.

Love argues that Hoffmann should have called other hospitals or medical clinics to see if someone could perform the MRI sooner. But this argument is not persuasive. Mile Bluff Medical Center staff were aware that Love likely had a torn Achilles tendon and that his MRI was a high priority, but staff determined that he could wait until January 2 for his MRI. Even if I assume that another hospital could have performed an MRI sooner, Love has not shown that it was Hoffmann's role to second-guess the decision of hospital staff or to call around at other medical centers to see if someone could perform an MRI sooner.

As for the surgery, Love has presented no evidence that Hoffmann unreasonably delayed in scheduling the surgery. The evidence shows that Love met with Dr. McNelly, a doctor at Mile Bluff, on January 10 to review the MRI findings. The January 10 appointment was scheduled according to McNelly's availability. At the appointment, Love and McNelly decided that surgery was appropriate, and Hoffmann ordered surgery to be scheduled "ASAP." Love had his surgery on January 19, 2018. In the meantime, Hoffmann prescribed additional tramadol to Love for his pain. No reasonable jury could conclude from these facts that Hoffmann acted with deliberate indifference in ordering Love's surgery.

16

Finally, Love contends that Hoffman refused to see him after his surgery and persisted in ineffective treatment by continuing to prescribe him pain medications that were either ineffective, caused him stomach pain, or both. But the evidence shows that Love was seen several times by health services staff for his complaints of pain and infection. In his role as a prison doctor, Hoffmann was not obligated to see patients in health services each time they presented symptoms—that is the function of the nurses who triage inmate patients. The Eighth Amendment does not give Love the right to been seen by a doctor each time he complains about pain or other symptoms. In this instance, the record shows that Hoffmann routinely consulted with the nurses treating Love. As for Love's complaints about pain medication, the record shows that between December 26, 2017 and June 2018, Hoffmann prescribed multiple pain medications to Love, including ibuprofen, acetaminophen, aspirin, tramadol, Flexeril, meloxicam, Capsaicin cream, diclofenac, and duloxetine. Hoffmann also prescribed omeprazole and stool softeners to treat Love's stomach problems. Love has submitted no evidence suggesting that Hoffmann's treatment decisions were inappropriate under the circumstances.

In sum, the extensive treatment record recounted above shows that Hoffmann did not disregard Love's medical needs. No reasonable jury could conclude that Hoffmann acted with deliberate indifference to Love's Achilles tendon injury or related medical problems. Accordingly, Hoffmann is entitled to summary judgment on Love's Eighth Amendment medical care claims.

2. **Negligence**

The prison health staff defendants are also entitled to summary judgment on Love's state-law negligence claims. To prevail on a claim for negligence in Wisconsin, Love must prove that defendants breached their duty of care and that he suffered injury as a result. *Paul v. Skemp*,

17

2001 WI 42, ¶ 17, 242 Wis. 2d 507, 520, 625 N.W.2d 860, 865. Love has not submitted evidence from which a jury could conclude that prison staff were negligent. The evidence shows that the prison staff defendants provided continuous, appropriate treatment for Love's injury, including conducting an immediate assessment of his injury, transporting him to a local hospital, ordering an MRI and surgery, scheduling follow-up appointments with outside providers, assessing him in health services, and providing physical aids, pain medication, antibiotics, and physical therapy. From this record, no reasonable jury could conclude that prison staff breached any standard of care that might apply in this case.

**E. Hospital defendants**

The hospital staff defendants, defendants Heberlein and Schroeder, also moved for summary judgment on Love's negligence claims against them. They argue that Love cannot succeed on his negligence claims because he has failed to disclose an expert to give an opinion about the standard of care for emergency room doctors and nurses under the circumstances.

There is not diversity of citizenship between the parties, but this court can exercise supplemental jurisdiction over Love's negligence claims against Heberlein and Schroeder under 28 U.S.C. § 1367. But the general rule is that federal courts should relinquish jurisdiction over state law claims if all federal claims are resolved before trial. 28 U.S.C. § 1367(c)(3); *Burritt v. Ditlefsen*, 807 F.3d 239, 252 (7th Cir. 2015). In this instance, I will decline to exercise supplemental jurisdiction over Love's claims against Heberlein and Schroeder because I am granting summary judgment to the prison staff defendants on all of the federal claims. In addition, the facts relating to Love's claims against Heberlein and Schroeder have not been well-developed by either side, and the court has not invested significant resources considering

18

these claims. Love may refile these claims in state court, subject to the applicable Wisconsin statute of limitations.

## F. Love's requests for counsel

Also pending before the court are three motions that Love filed requesting that the court recruit counsel to represent him in this case. Dkts. 35, 67, 98. He argues that his imprisonment has limited his ability to litigate, the prison law library is inadequate, the issues are too complex for him to understand, and he has been unable to find an expert who can give an opinion about the standard of care.

As I explained to Love previously, this court recruits counsel for a pro se litigant in a civil case only if the litigant shows that this is one of the relatively few cases in which it appears from the record that the legal and factual difficulty of the case exceeds the litigant's demonstrated ability to prosecute it. *Pruitt v. Mote*, 503 F.3d 647, 649 (7th Cir. 2007). "The question is not whether a lawyer would present the case more effectively than the pro se plaintiff" but instead whether the pro se litigant can "coherently present [his case] to the judge or jury himself." *Id.* at 655.

In this instance, I am not persuaded that the complexity of this cases exceeded Love's ability to prosecute it. Love's summary judgment materials were clear, comprehensive, and well-reasoned. His legal and factual arguments made sense and were on point. Ultimately, the problem for Love was not that he was unable to understand the complexity of the case or present expert testimony, but that the undisputed facts show that defendants did not act with deliberate indifference toward his medical needs. Therefore, I will deny his requests for counsel.

ORDER

IT IS ORDERED that:

1. The motion for summary judgment filed by defendants Karl Hoffmann, Koreen Frisk, Carol Swan, Nicole Krahenbahl, Bridget Rink, and Maryah Martin, Dkt. 45, is GRANTED.

2. Plaintiff Xavier Love's claims against defendants Heberlein and Schroeder are DISMISSED without prejudice under 28 U.S.C. § 1367(c)(3).

3. The motion for summary judgment filed by defendants Mark Heberlein and Michelle Schroeder, Dkt. 37, is DENIED as moot.

4. Plaintiff's motions for recruitment of counsel, Dkt. 35; Dkt. 67; Dkt. 98, are DENIED.

5. The clerk of court is directed to enter judgment accordingly and close this case.

Entered August 23, 2019.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge